Good morning, Your Honors. May it please the Court. I'm Dana Johnson for Appellate Wilderness Watch, and I'd like to reserve a few minutes for a rebuttal today. Certainly. I'll keep an eye on the clock. Your Honors, this case is about whether the reconstruction of buildings and wilderness for historic preservation is permitted by the Wilderness Act. Congress defined wilderness as areas of undeveloped federal land retaining their primeval character and influence without permanent improvements, which is managed and protected to preserve its natural conditions and its specifically prohibited structures in wilderness, except as necessary to meet minimum requirements for administration of the area for the purpose of the Wilderness Act. Notwithstanding the statutory mandates, the Park Service in this case undertook major reconstruction efforts on five buildings in the Olympic Wilderness, citing broad discretion under cultural resource laws and policies, and by attempting to shoehorn the preservation of buildings into the Wilderness Act's reference to historical use. But there's two fundamental problems in this case, Your Honor. The first is that these replicas do not serve the purpose of the Wilderness Act as required by the exception provision, and secondly, even if we were to set that first problem aside, the Park Service cannot demonstrate that the structures were necessary to meet minimum requirements for administration of the wilderness. And, Your Honors, while this Court has not addressed whether the historic preservation of buildings serves the purpose of the Wilderness Act, the 11th Circuit has, and it specifically found that the need to preserve historic structures may not be inferred from the Wilderness Act nor grafted onto its general purpose. And I'd like to explain today why the 11th Circuit's opinion is directly on point to this case, and how this Court's decision in Wilderness Watch v. Fish and Wildlife Service, or the COFA opinion, does not preclude Your Honors from holding consistent with the well-reasoned position of your sister circuit. Your Honors, in the Wilderness Watch v. Manila case, or the Cumberland Island case that was Cumberland Island Wilderness to perform restoration work on historic properties located just outside of the wilderness boundary in a potential wilderness. And to justify the motorized use in that case, the Park Service argued that Section 1133B of the Wilderness Act allows wilderness to be devoted to multiple public purposes, including historical use, and the structures, which the Park Service argued constituted a historical use. And so the 11th Circuit in that case said that it had to resolve the issue of whether the historic preservation of buildings serves the purpose of the Wilderness Act. And to do that, it engaged in a thorough statutory construction analysis to come to its conclusion. And it found that given the Act's definition of wilderness as undeveloped federal land, retaining its primeval character and influence without permanent improvements, and given its explicit prohibition saying there shall be no structure in any such area, it could not agree with the Park Service that the preservation of historic structures furthers the goals of the Wilderness Act. And secondly, the reason that that case is directly on point to the situation here is the 11th Circuit also held that the Act's references to recreational, scientific, educational, and historical uses in Section 1133B, which are the public purposes, tracks the definition of wilderness in Section 1131C, which describes a primitive and unconfined type of recreation. The problem, counsel, and I understand why you're focusing so much on the 11th Circuit case because that's favorable in terms of your view of historical use, but we've got to deal with COFA. And although COFA pertains to conservation, I really don't see an analytical distinction. In COFA, we've already found that there's conflicting policy directives in terms of conservation. So why should that be any different in terms of historical use? Right, Your Honor. I think there's two points of distinction with the COFA case. And the COFA panel did not analyze the term historical use to figure out what that term's meaning is within the overall statutory scheme. And so this panel is not restricted by the COFA holding in undertaking that analysis. And we believe the 11th Circuit got that analysis right that given the overall statutory scheme of the Wilderness Act, the term historical use itself. Right, and I recognize that COFA didn't deal directly with the term historical use, but as an analytical matter, I just don't see the distinction because when you look at 1133B and the reference of public purpose, it says for recreational, scenic, scientific, educational, conservation, and historical use. So I don't see why historical use doesn't produce the same sort of tension that we identified in the COFA case. I think it's because historical use and all of the other public purposes in Section 1133B have to be considered in light of the overall statutory scheme. And conservation is different in that regard because conservation efforts, and in the COFA case, the conservation effort was to conserve a native wildlife species within the wilderness, which would be a natural component of the wilderness, is different. It's more closely tied to the overall purpose of the Wilderness Act than preserving buildings for the sake of preserving buildings, where that underlying purpose is very much at odds with both the overarching purpose, the definition of wilderness, and the act-specific prohibition on structures. And so the district court... statute isn't, at a minimum, ambiguous. And then we get into Skidmore analysis rather than the kind of analysis that you're offering. Right, Your Honor. If this panel decides that the statute is clear, of course, there's no deference to the agency, but I don't think the standard of deference is in dispute, and it's Skidmore deference if the panel determines that the term historical use is ambiguous. Your Honor, even if this court were to find that that term is ambiguous, which we don't believe it is based on the analysis that the 11th Circuit performed, the agency still has to show that the structures in this case are necessary to meet minimum requirements for administration of the wilderness. And they can't show that for two reasons. The first is that the agencies, all of the agencies, have various alternatives available to them to discharge their obligations under historic preservation laws without offending the Wilderness Act. And there's no restrictive provision in any historic preservation law or any cultural resource law that requires them to rebuild structures inside of wilderness. So the agency cannot manufacture a conflict between the statutes in this case where none exists. We have a specific provision in the Wilderness Act. But isn't the historic value of assuming that we, you know, don't accept the 11th Circuit analysis, isn't the historic value of a structure like these particular structures partly related to exactly the location where they exist in the fashion in which they were originally created? So how can the Park Service under that analysis do anything other than keep them in proper condition in their historic location? I think the question is still about minimum requirements, not the most preferred alternative available to the Park Service. The Wilderness Act doesn't say for the most desirable administration of the wilderness. It says to meet minimum requirements for administration of the wilderness. Yeah, but the minimum requirement here is that of historic value, historic use. Those are the two terms that appear, right? The minimum requirement would be to administer the area pursuant to the purpose of the Wilderness Act. Well, but we've gone one step further in this part of the argument. We're assuming that one of the purposes of the Wilderness Act, given the ambiguity which we're assuming, arguendo, is to preserve historical value and historic use defined to include structures. In that, once, I know you disagree with those various premises, but assuming those premises, then doesn't it follow that the historic value is the interrelationship between these particular structures and their immediate environment? I think that it still butts up against the presumption that structures are prohibited under the Wilderness Act, and the minimum requirements have to be read in light of that specific statutory prohibition. I think Your Honor's question is, do they have to preserve these buildings in their current location, sitting at the end of the trailhead where they're sitting in the Olympic wilderness, to meet those minimum requirements to preserve historical values? In this case, I don't believe so, Your Honor. They could move that structure down the trailhead, say five miles outside of the wilderness boundary, and highlight it there. Then they would be preserving historic structures of the Olympic National Park, and of the structure, and also be in accordance with the more restrictive provisions of the Wilderness Act that says there shall be no structure in wilderness. Your argument depends on this panel accepting the argument that historical use means only natural, not human-related uses, right? I don't think so. The district court, and I know this court is not bound by the district court holding, but I think Judge Kuhnauer in the Iwamoto case analyzed a similar circumstance where he found the term historical use ambiguous based on what he perceived he was required to do from the COFA holding. Even with that, he still found that the agencies had various options available to them to preserve both the historic value of the structure and the area by relocating the structure or maintaining photographic evidence of the building. I think all of those alternatives are available in this case, regardless of whether Your Honors agree with the Eleventh Circuit on the meaning of the term historical use. Your Honor, I'd like to step back and spend just a little bit more time picking apart the term historical use. Wilderness Watch, of course, believes the Eleventh Circuit got it right and that you can reach that conclusion based on a plain reading of the statute. But even if this court were to look beyond the plain language of the statute, the Senate report from 1963 indicates the same conclusion. And there it explains how the recreational, educational, scientific, and historic values of wilderness interact with and complement one another. And it says that wilderness hikers and students and scientists alike learn from and enjoy evidence of geological and natural history, conservation and resource management by natural forces, and the interrelationships of various forms of life. The legislative history of the Wilderness Act also indicates the Congress was contemplating natural features rather than man-made features when it was discussing the term historical value and historical use in the Wilderness Act. And so, Your Honors, going back to Section 1133B, while the Wilderness Act would contemplate various forms of primitive recreation, it prohibits forms of motorized recreation because they're incompatible with the overarching purpose of the Act and the Act's specific prohibition on motorized use. And the same thing would apply to the term historical use. It encourages historical uses of the natural environment, such as hiking, studying, enjoying evidences of natural forces at play in the wilderness. But the preservation of buildings is prohibited by the statute because the structures are incompatible with the definition of wilderness, the overarching purpose of the Wilderness Act, and the Act's specific prohibitions. And, Your Honors, I briefly touched on there's no other statute at conflict in this case, and I don't believe that that is in dispute. It is clear from this Court's case law and from other circuits' case law that the National Historic Preservation Act is a purely procedural statute, and it does have restrictive provisions that apply in wilderness, but it simply requires the agencies to consider the impacts of federal actions on historic properties before they take those actions, and to allow the Advisory Council an opportunity to comment. And once it meets those procedural requirements, it's afforded wide discretion to take or not take a variety of preservation actions, such as the examples I've already provided to Your Honors. And the second, I want to jump forward again to the minimum requirements consideration if this Court has trouble with the first issue. The second point that the structures are not necessary to meet minimum requirements for the administration of the area is made clear in this case because the Park Service admits that it has not made a finding of necessity for any of the structures in this case. It instead claims that it has made a placeholder determination to prevent the loss of the structures so that it can determine later in its wilderness stewardship planning process whether it's admitted that it's still considering whether it's going to remove the structures from their current location and relocate them to another area, let them degrade in their current location, or take any other of the alternatives that they have available to them. And Your Honor, that too indicates that the Park Service, whether you're looking at preservation for historical use, if the Court goes there, there's various options available to the Park Service under either of those interpretations for preserving the structures in this case. Your Honor, because the Park Service's actions cannot be justified by the narrow administrative necessity exception in this case, and because no other statute requires the actions taken here, Wilderness Watch requests this Court reverse the District Court's opinion, vacate the agency's decisions, and remand to the District Court for further consideration of remedy, as that was not briefed before the District Court. I'd like to reserve the rest of my time for rebuttal, please, unless there's further questions. Thank you. Good morning, may it please the Court. My name is Andrew Mergen, I'm here on behalf of the National Park Service. With me at the Council table is David Bechtold, who represents the National Trust for Historic Preservation and others in this litigation, and I'm going to endeavor to give him about five minutes. The fact that Mr. Bechtold is here on behalf of his clients, I think, in part, illustrates the profound difficulties in administering wilderness under this really interesting and difficult to administer statute, and important statute. Maybe one place for me to start is on the case law that my colleague referenced, the 11th Circuit Cumberland Island case and the Iwamoto case from Judge Kuhnhauer. I think both of those cases are readily distinguishable, and I think, first, insofar as Maynella is concerned, I think a fair reading of that case is it really is about the motorized transport. As Judge Barquette explains in her opinion, what the Park Service was doing was piggybacking transport in a 15-passenger van for visitors to the wilderness on the basis of this historic preservation work. I think that the court looked at that and saw that, more or less, as pretextual. As the court says in its own precise language, the case turns on this motorized use, for which there is always going to be a high standard under the Wilderness Act. The discussion of historic use and purpose in that decision, I would say, is what may sometimes be referred to as a drive-by holding. The court really did not dig deep into that purpose in the same way that Judge Layton did here in his very thorough and thoughtful opinion. Iwamoto, which is the Glacier Peak Fire Tower, I think it's important to note, and this is very clear on page 1207 of Judge Layton's decision, and it's also clear from the opinion itself, that structure was not eligible for listing in the National Register of Historic Places. It's really important to Judge Kuenhauer's decision in that case is that he understood that there was a tension between those purposes. That's the fundamental holding of this court in COFA. That the Wilderness Act expressly references in 1133B these other purposes, including historical use. And the definition in 1131 talks about historical value. And I don't mean to disparage the analysis in the Eleventh Circuit, but when I suggest that it is not particularly thorough on this point, I think it's clear that this plain language and the use of context, I beg to differ with my colleague, really suggests that this is about how we all generally understand history as being human history in the environment. And that the Wilderness Act would nod to that is hardly surprising. After all, the Act talks about primitive recreation. The Act itself was advocated by people who went to the wilderness, who found profound value in those environments, and sought to preserve for future generations that opportunity to experience wilderness in the manner that they had. Congress had intended to limit this to natural history. They could have used that very common everyday term, natural history, but they didn't. I completely agree, Your Honor. I think that read as a whole, as we must, the text of the statute clearly understands human history as being part of the landscape. And wilderness administration is difficult. It's difficult for those folks, like my client, who is charged with administering this incredibly popular park under the strictures of this Act. 877,000 acres of the park of some 920 are wilderness. But people have to have access, trails have to be maintained. There are these five qualities of wilderness that the managers are looking at. And they are assessing their management decisions mindful that there will be trade-offs in these five wilderness qualities, right? The untrammeled nature of wilderness, the wilderness undisturbed, the opportunities for solitude, and these other purposes, which is the minimum requirements worksheets make plain in this case, which are extensive documents and demonstrate a thorough and robust look at these issues. They are assessing those trade-offs informed by the use of history in the Act itself, the commands of the NHPA, the Historic Sites Act. Significantly and not mentioned by my colleague, the National Park Service Organic Act, which the Park Service manages under a preservation mandate that makes it different from other wilderness managers, like the Forest Service, Bureau of Land Management, Fish and Wildlife Service. And at the turn of the last century, when Congress gave the Act to the National Park Service, the National Park Service was not conserving historic objects for the enjoyment of future generations on a non-impairment basis. So your adversary says the Park Service is still considering possibly moving these structures out of the wilderness area. And why shouldn't they have to fish or cut bait on that issue before they're allowed to go in and bring in helicopters and the whole business? Yeah, no, I think, Your Honor, that's a very good question, and I want to address that head-on. I think what my colleague is relying on there is a colloquy between government counsel and Judge Layton, and the transcript pages, I believe, are in their supplemental excerpts of record. And in that colloquy, which largely relates to the fact that the Park Service for this park is working on an overall wilderness plan, there's some, the colloquy indicates that the fact that these five structures are going to be repaired and maintained, and language is important here. I mean, my colleague respectfully refers to replicas, but that's not what is at issue here. This is repair and maintenance of these structures. That in the future, under a wilderness plan, the way that these issues are going to be assessed may be different and will be informed, you know, by the state of the law and the like at the time that that plan is finalized. But that's not to say that for, I mean, these structures, these five structures have been repaired. And that was the decision, the final agency action of the agency. That's what is at issue here. They're not going to propose down the line breaking them down and moving them elsewhere. And this idea about structures being moved, I think, is really important, and it relates to the Iwamoto case. You'll recall that if you go to the decision in Iwamoto, that fire tower was not eligible for listing on the Federal Register. Well, I don't, I completely agree with my colleague that the NHPA is a procedural statute. But as this court knows from its experience with the National Environmental Policy Act, procedural statutes sometimes have a lot of thresholds, a lot of hurdles, create a lot of work for the agency. And for these structures that are eligible or listed on the National Register, for them to move them outside of the wilderness boundary, that implicates the processes of the NHPA, because that is an adverse effect on a historic property for exactly the reasons that you set forth earlier, Judge Rakoff, which is part of their historical character is the location, the way they're built into the fabric of the surrounding landscapes. To give you one example, the Canyon Creek Shelter on the Sulduck Trail, very accessible shelter within the park, less than a mile from the parking lot really, it's built by the Civilian Conservation Corps in a rustic style. It is intended to blend into the landscape. To move that shelter out of that landscape and put it somewhere else deprives it of that integrated fabric that makes it eligible and it is listed on the National Register because of that particular context. But even beyond that, it would be an adverse effect to these structures. Not true of the fire tower in Uomoto, but true for these structures here. I mean, this is an instance where the park, as part of their wilderness management, is tailoring their repair and maintenance and stabilization of these structures consistent with historic preservation laws. And again, it is true that nothing requires them to repair these structures and it is undoubtedly true that some of these structures may not be repaired depending on particular circumstances. You'll see that there was a difference between the original complaint and the amended complaint in my colleague's excerpts of the record and that's because one of the shelters dropped off. I mean, the shelter was destroyed and the Park Service made the decision that they're walking away from restoring that. Each of these is a contextual decision. And I want to talk about the as necessary to meet minimum requirements for the administration because I think I can't improve on – sometimes, Your Honor, district courts get it exactly right and I submit to you that Judge Layton did that here. And I can't improve on the analysis that he did on page 1207 of the report. Even his stopwatch is right twice a day. Yes. Well, in this case, the watch was really right, Your Honor. And his analysis about the steps as reflected in the administrative record about the necessity, the minimum needs, there is great care taken on the part of the agency in terms of its duty to wilderness stewardship and its historic preservation mission. We've got the argument. All right. I'm going to give my colleague a few minutes. Yes. Thank you. Thank you. Good afternoon, Your Honors. My name is David Bechtel, and I represent the interveners here. I think you've already hit kind of the nail on the head that at the core of this case is this fundamental question of why are we protecting historic structures and wilderness areas. What do these objects of historic value add to the wilderness characteristics of the Evans Wilderness? And I think there are two answers to that question that are important, one a philosophic answer and, second, a legal answer. Philosophically, I think it's important to look back at why we protect wilderness in the first place. In 1964, when the Wilderness Act was passed, Congress recognized that there were fewer and fewer truly wild places left in the United States, and if they didn't step in, we would lose this concept of wilderness in our country. They also recognized that wilderness was very important to us as an American people. How can you say there are not truly wild places still left when Congress is still in session? Sorry. Well, the Wilderness Act. It was irresistible. Yeah. Well, so getting back to the Wilderness Act, what they recognized is that, one, we needed to protect these wild places, but also that these wild places were important to us culturally. And so going back tens of thousands of years to Native Americans who lived in these lands and have an incredible amount of history tied up into them, and even to when Europeans came, we always, as Americans, had this sense of there was a wilderness out there and there was a frontier and a pioneering spirit. And you can see this just based on the stories we tell our children from their earliest ages, whether it's Johnny Appleseed going into the wilderness to plant trees or Lewis and Clark exploring the Louisiana Purchase or pioneers going west on the Oregon Trail. There has always been part of us tied up in wilderness. And so what Congress did when it passed the Wilderness Act is it wasn't just setting aside these large resources of land for environmental protection, but it was also protecting part of our culture and who we are and our history and allowing our children to go into these places and experience what it was like 100 years ago. To go into cabins in Olympic National Park and realize what it was for their grandfathers who were the first generation of Americans to experience national parks. And that is what is protected by the Wilderness Act. And so philosophically, there is nothing improper or at odds about protecting the historical places in the wilderness because we as Americans have always been part of a wilderness. And preserving that is an important goal of the act. And then the second answer, the legal answer, which is what we've already talked about, is that if you take the Wilderness Act and its operative statute and you look at it, every place where you would expect historical preservation to appear if it was a goal of the act, it appears. So if you look at the definition of wilderness, it's defined to include objects of historical value. If you look at the defined uses, it includes the use of historical use, which we've talked about. But then the important role the National Park Service plays is also preserved in 1133A3 where it instructs the National Park Service whose mission is in part from the organic act to protect objects of historical value. It says do not lower any of your historic preservation standards here. So it's the position of the National Trust that the Wilderness Act actually is unambiguous. And it's unambiguous in its support of preservation of structures and history in our wildest places. And I think you guys have gotten the argument, so unless you have any questions, I will sit down. We don't have any questions. Thank you. Your Honors, I just have a few points that I'd like to address on rebuttal. And the first is I'd like to provide a more direct site to the wilderness stewardship planning draft alternatives that include the various alternatives that I mentioned, and that's at ER 170 to 171. Those are the preliminary draft alternatives for the wilderness stewardship plan. And the second point that I'd like to make is that these are largely replica structures that have been built in this wilderness. The Wilder structure only had 10% of the building that was salvageable. It was completely collapsed. That is indeed a replica structure. The Canyon Creek and the Elk Lake structures have been crushed by trees on multiple occasions and rebuilt on multiple occasions. And in many of those instances, they were rebuilt using helicopters and motorized tools and gas-powered drills. And these are things that have occurred on multiple occasions within the wilderness. And those uses are also prohibited under Section 1133C. And so the impact of rebuilding these structures beyond the impact from the structures themselves includes all of these peripheral uses that are generally prohibited by the Wilderness Act. And I think that that demonstrates the general incompatibility with wilderness in preserving these structures in the long term as well. The third point that I'd like to make, Your Honors, is that Section 1133B says that those public uses are contemplated except as otherwise provided in this Act. And the other provisions in this Act specifically say that there shall be no structure in wilderness. And the definition of wilderness defines wilderness as undeveloped federal land without permanent improvements. And so the term historical use in Section 1133B has to be read in context of those other provisions. And the last point that I'd like to make, Your Honors, is I appreciate the passion that has been expressed by all of the parties in this case and the passion for preserving historic structures. Wilderness Watch appreciates that passion. But the landscape that the interveners in the Park Service are attempting to preserve in this case is the landscape that's been permanently marked by man and permanently claimed by man. And that is not the landscape that Congress intended to protect under the Wilderness Act. Congress intended to protect an older part of our history when it enacted the Wilderness Act. It's increasingly difficult in this country to find places where somebody can walk for miles without encountering a building and where they can experience the primeval landscape as it was in the beginning before man started manipulating that landscape with permanent structures. There are over 1.4 million individual buildings, sites, and objects listed on the National Historic Register. And the agencies have various alternatives, as I mentioned, for preserving those, including relocating the few that are located inside wilderness to areas outside. And in the Olympic Wilderness, there are roughly 40,000 acres of parkland outside of the wilderness boundary where the Park Service could relocate these structures if it wished to highlight them. There's no option for relocating the very small percentage of land that Congress set aside as wilderness. And Wilderness Watch asks this Court to protect this unique and increasingly threatened piece of our history, as Congress intended. Thank you, Your Honors. Thank you very much, Counsel, for both sides. The matter is submitted for decision.
judges: Fernandez, Nguyen, Rakoff